398 So.2d 963 (1981)
Wesley Calvin WOOTEN, Appellant,
v.
STATE of Florida, Appellee.
No. TT-105.
District Court of Appeal of Florida, First District.
May 13, 1981.
Rehearing Denied June 16, 1981.
*964 Michael J. Minerva, Public Defender, and Margaret Good, Asst. Public Defender, for appellant.
Jim Smith, Atty. Gen., and Miguel A. Olivella, Jr., and A.S. Johnston, Asst. Attys. Gen., for appellee.
LARRY G. SMITH, Judge.
Appellant seeks reversal of his conviction of second degree murder based upon his contentions that the trial court erred in denying his motion to suppress evidence seized from his apartment, and that at the trial the court erred in admitting testimony over his "Williams Rule" objection, in admitting *965 inflammatory photographs of the victim, and in denying his motion for judgment of acquittal and request for a mistrial. We affirm.
A passer-by happened to see the appellant on the street carrying the victim, a thirteen-month old baby girl, the child of appellant's girlfriend, who was living with him in his apartment at the time. After observing appellant shake, yell at, and appear to strike the baby, the passer-by followed to see where appellant lived, and then flagged down a policeman, whom he led back to appellant's apartment. Upon arrival at appellant's apartment, the police officer, Swisher, asked to see the child, at which point appellant denied having harmed the child, but went and got the child from the kitchen area and brought her to the officer. Officer Swisher then asked appellant to bring the child to a bathroom in the hallway outside the apartment for examination. Upon observing that the child appeared lifeless, and being unable to detect a heartbeat, the officer instructed appellant to return the child to the apartment and place her on the bed, which he did. The officer called for backup and rescue personnel to assist him, then continued his examination of the child. He requested that appellant place the child on the floor, as he was prepared to administer cardiopulmunary resuscitation. Within moments, the rescue personnel, his backup, patrolman Andrews, and an evidence technician, patrolman Meyer, arrived. Rescue immediately removed the child to the outside for further examination and rescue efforts. Officer Swisher took appellant outside, advised him he was under arrest for aggravated child abuse, advised him of his rights, and placed him in the patrol car. Officers Andrews and Meyer remained upstairs at defendant's apartment. Swisher had instructed officer Andrews to "seal off the room." Swisher's supervisor, Sergeant Eason, and detective Richardson then arrived on the scene, and were informed by Swisher of what had taken place. Detective Richardson was advised by Swisher that the victim's mother and another child, the victim's baby sister, also resided in the apartment. Detective Richardson was also informed by uniformed officers present on the scene that there were what appeared to be blood stains in the apartment. Armed with this knowledge, detective Richardson entered the apartment, and he and the other officers began to process the area for evidence. He observed blood stains on the kitchen floor, along with various items of wearing apparel and bed clothing, some of which appeared to have blood stains on them, along with a belt which also had a stain which appeared to be blood. All of these items were in open and plain view, and were seized by the officers, along with a brush and a comb. Officer Meyer took photographs of the scene and of the physical objects prior to their being seized. Examination further revealed blood stains along the north wall of the stairwell leading to the apartment, and these blood samples were removed, as were those from the kitchen floor inside the apartment.
Officer Swisher testified that there was no one at the apartment other than appellant and the apparently lifeless child when he arrived. In view of the small size of the apartment, which consisted of only a living-sleeping room, and a kitchen, it is highly likely that the other officers were also aware that no one else was in the apartment. When asked why he did not obtain a warrant prior to the search and seizure of items in the apartment, detective Richardson stated that he had received information that the victim's sister and mother were also residing in the apartment, and he was also aware that there was blood and possible other physical evidence which would be pertinent to the incident. He had already been informed of the serious, possibly fatal injuries to the child, possibly resulting from actions of the appellant, who had been seen striking the child.
Detective Richardson also testified that he learned during his investigation that the mother and the other child were at University Hospital. However, it is impossible to determine from the testimony at the suppression hearing at exactly what point in the investigation detective Richardson acquired *966 this knowledge. It therefore remains unclear just exactly what bearing, if any, detective Richardson's knowledge that the mother and another child resided in the apartment had on his decision to proceed with the investigation, search and seizure of items from the apartment without a warrant. The State in its brief before this court asserts that it was necessary for detective Richardson to enter the apartment to determine if there were other persons who might need medical attention. We find nothing in the record to support this assumption. Furthermore, although we would ordinarily assume that concern for the safety of the mother and the other child motivated detective Richardson's entry on this occasion, we cannot make such an assumption because officer Swisher knew there was no one else present, and we would have to conclude that the other officers present in the apartment when Richardson arrived were also aware that no other persons were there.
In support of his suppression argument, appellant relies primarily upon Mincey v. Arizona, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978), in which the court firmly established that there is no "murder scene exception" to the warrant requirement of the Fourth Amendment. The facts in Mincey were briefly that several officers entered Mincey's apartment without a warrant or consent, whereupon a gun battle ensued, leaving one of the officers dead, and Mincey seriously wounded. After the shooting a search for other persons in the apartment was made, but no other search or seizure of any evidence was made until homicide detectives arrived some ten minutes later. The detectives then proceeded to gather evidence in a search that lasted four days, during which time the entire apartment was searched, photographed and diagramed. All drawers, closets, and cupboards were opened and inspected, clothing pockets were emptied, bullets were dug out of the walls and sections of the carpet pulled up and removed for examination. Some 200 to 300 objects were seized.
We think the facts in this case vary substantially from those in Mincey. Initially, we are confident that the entry by officer Swisher was justified by the "exigent circumstances" presented by his prior knowledge of the possible abuse of the child, and upon observing the child itself, the need to protect the child, determine its condition, and to immediately secure whatever medical or other attention might be necessary. Furthermore, Swisher's presence in the apartment would appear to be consensual, at least up to the point where Swisher's concern over the child's serious condition became apparent to appellant. Swisher's presence in the apartment is amply justified by the circumstances which indicated that the child was in need of immediate aid, which he proceeded to obtain. This type of entry is not prohibited by the Mincey decision. The Mincey opinion states (437 U.S. at 392, 98 S.Ct. at 2413):
... We do not question the right of the police to respond to emergency situations. Numerous state and federal cases have recognized that the Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that the person within is in need of immediate aid... . (footnotes omitted)
Florida is among those jurisdictions so interpreting the Fourth Amendment. Webster v. State, 201 So.2d 789 (Fla. 4th DCA 1967); State v. Hetzko, 283 So.2d 49 (Fla. 4th DCA 1973); Gilbert v. State, 289 So.2d 485 (Fla. 1st DCA 1974); Long v. State, 310 So.2d 35 (Fla. 2nd DCA 1975); Hornblower v. State, 351 So.2d 716 (Fla. 1977); Evans v. State, 364 So.2d 93 (Fla. 3rd DCA 1978); Johnson v. State, 386 So.2d 302 (Fla. 5th DCA 1980). See also Grant v. State, 374 So.2d 630 (Fla. 3rd DCA 1979), a post-Mincey decision applying the "plain view" exception where the entry was justified under another aspect of the "emergency" or "exigency" rule.
We also conclude that the subsequent observation and seizure of items in the apartment by detective Richardson and the officers assisting him did not violate the Fourth Amendment. Officer Swisher's observation *967 of the child and of the actions of appellant led him to conclude that the child was in grave condition, and that appellant was probably responsible. It was entirely reasonable, in our opinion, for the rescue personnel and the other officers who arrived momentarily to also enter the apartment to render further assistance in caring for the child and to provide support for Swisher, the lone officer present when they arrived. While in the apartment for this legitimate purpose the officers observed in plain view what appeared to be blood stains on the floor and upon several of the items taken. We also conclude that it was reasonable for detective Richardson, who arrived only a few minutes after Swisher left the apartment, to confirm the existence of the blood stains that he had been informed of, and to direct and assist in the taking of photographs, blood samples, and the seizure of the suspected items of evidence which were in plain view. There was no inspection of drawers or closets, and no seizure of any items not directly related to the incident of suspected child abuse.
It cannot be concluded that at the time detective Richardson arrived on the scene the "exigency" was necessarily over. Examination and emergency treatment of the child was still in progress, although the rescue unit had left the scene, enroute to the hospital with the child. While we do not find it articulated by the officers testifying at the suppression hearing, we think the circumstances were such that further investigation of the apartment was justified for the purpose of determining if there was evidence that might shed some light upon the cause of the child's condition, which in turn might have been of assistance in her diagnosis and treatment. See Long v. State, supra. In this connection we note from the trial testimony that the child still had a heartbeat when she arrived at the hospital emergency room. Since the trial judge made no findings in his order denying the motion to suppress we cannot state that he took into account the necessity for continuing investigation by the officers as a possible aid to the child. However, detective Richardson testified that he did not obtain a warrant because, among other reasons, he was aware "that there were blood and possibly other physical evidence which would be pertinent to this particular incident." Further immediate examination of the apartment from which the seriously ill or injured child had just been removed would seem to be normal and reasonable police procedure under the circumstances, and it appears to us that evidence "pertinent to the incident" could embrace that which might have possibly assisted the child as well as that which might tend to incriminate appellant.
We do not think that Richardson's entry of the apartment and seizure of evidence exceeded the bounds permissible under the exigency rule. Appellant urges that the exigency had ceased by the time Richardson arrived, and that his subsequent one hour to one hour forty-five minute search was not the type of cursory warrantless search sanctioned in Mincey. We disagree, based upon our view that the entry of all officers on the scene was part of one continuous episode, initially justified by exigent circumstances. We know of no decision and no logical basis for holding that a lawful entry is limited to a single officer, nor any rule that prohibits one officer, legitimately on the premises, from being joined by a sufficient number of his fellow officers, or his superior officers, to take charge and to perform the police functions which are then immediately justified and required. Michigan v. Tyler, 436 U.S. 499, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978), is instructive on this point, even though the entry in that case was by firemen, initially, for the purpose of extinguishing a fire in a commercial building. The facts are that firemen first arrived, followed by the fire chief at about 2:00 a.m. Upon being advised of indications of arson, the chief called a police detective, who arrived at about 3:30 a.m. He took several photographs, but had to abandon these efforts because of the smoke and steam. Around 4:00 a.m. the fire had been extinguished and the firefighters left the scene, as did the chief and detective. They took certain containers to the police *968 station, and then four hours later, the chief returned with an assistant fire chief. At this time the fire had been extinguished and the building was empty. After a brief examination they left, and then the assistant fire chief returned with the same police detective at around 9:00 a.m., at which time they discovered evidence indicating intentional burning. Upon making this discovery, they left the building to obtain tools, then returned and removed several items of evidence. All of these entries and the seizure of evidence were approved, the court stating (98 S.Ct. at 1951):
... Under these circumstances, we find that the morning entries were no more than an actual continuation of the first, and the lack of a warrant thus did not invalidate the resulting seizure of evidence.
The court pointed out, however, that entries made several weeks after the day of the fire, without a warrant, were unlawful, because they were "clearly detached from the initial exigency and warrantless entry." (98 S.Ct. at 1951). In summation, the court held that an entry to fight a fire requires no warrant, and that once in the building, officials "may remain there for a reasonable time to investigate the cause of the blaze." Thereafter, said the court, "additional entries to investigate the cause of the fire must be made pursuant to the warrant procedures governing administrative searches." (Id. at 1951)
Innumerable instances can be cited, some from recent cases, of lawful warrantless entry by several officers. See for example, Preces v. State, 378 So.2d 77 (Fla. 3rd DCA 1979), and State v. Schwartz, 398 So.2d 460 (Fla. 4th DCA 1981). In Schwartz, an officer whose initial entry to the defendant's home was by invitation, for the purchase of illegal drugs, left the house to return to his automobile to obtain the money for the purchase. That officer and two others, according to prearranged plan, then returned to the residence where they arrested the defendant and seized contraband. Holding that it was unnecessary for the officers to comply with the "knock and announce" statute for reentry to the premises, the court said that the first officer, who was lawfully on the premises, had an implied invitation to return without the necessity of complying with the statute and: "The fact that he enlists the aid of other officers does no injustice to the statute or the constitution. It neither adds to, nor detracts from, the reasonableness of the reentry."
In summary, we conclude that under Mincey, Tyler, and the Florida decisions referred to, officer Swisher's entry to appellant's apartment was lawful, it was lawful for other officers to enter to assist him and to take charge of the premises while Swisher was occupied with the arrest and removal of appellant, and that it was also lawful for detective Richardson to enter for the purpose of supervising and completing the limited investigation of the premises and the seizure of items of evidence or suspected evidence in plain view. As for appellant's objection that some of the items were not in and of themselves obviously of an incriminating nature, we understand the rule to be that not only fruits or implements of the crime, weapons and property, the possession of which is itself a crime, may be seized, but that also mere evidence can be seized provided there is probable cause to believe the evidence will aid in a particular apprehension or conviction. Warden v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 783 (1967); Andresen v. Maryland, 427 U.S. 463, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976). See Neary v. State, 384 So.2d 881 (Fla. 1981). The evidence here shows a sufficient connection between the items seized and the particular crime the officers had probable cause to believe had been committed.
Appellant's contention that it was error to admit evidence that appellant beat or physically mistreated the victim or the victim's sister, a two-year old, prior to the date of the alleged offense is disposed of by recent as well as established case law. See Sireci v. State, 399 So.2d 964 (Fla. 1981), and Cotita v. State, 381 So.2d 1146 (Fla. 1st DCA 1980), pet. for rev. den. 392 So.2d 1373 *969 (Fla. 1981). We have considered and find no reversible error in the remaining points on appeal.
The judgment and sentence appealed from are AFFIRMED.
ERVIN and SHIVERS, JJ., concur.